THE MAYOR, &C. OF NEW YORK *vs.* RUFUS L. LORD, AND DAVID N. LORD.

Under the act relating particularly to the city of New York, in case a *building* is destroyed by order of the Magistrates, to prevent the spread of a conflagration, a *tenant* of the building is entitled to recover damages not only for his *interest in the building*, but also for merchandise or *personal property* belonging to him, which was in and destroyed with the building.

Whether any person other than a *tenant* can recover for *personal property* which was in and destroyed with the building, *quere.*

ERROR from the supreme court. In tne great fire in the city of New York, in December, 1835, a building belonging to R. L. Lord was blown up by the direction of the mayor, to prevent the spreading of the conflagration. D. N. Lord was, at the time, the *tenant* of the building, and had in it *merchandise* to a large amount. The order for the destruction of the building was made in pursuance of authority conferred by § 81 of the general act relating to the city of New York, (2 *R. L.* 368); and under the same section an assessment of the damages sustained by the *landlord* and by the *tenant* was had, by which the sum of $156,274.80 cents were assessed to the tenant for the damages sustained by him. The interest of the tenant *in the building* was an unexpired term ending 1st May, 1836, for which he paid an annual rent of $2,500. The damages assessed to him, with the exception of his interest in the building, was for [127] merchandise or *personal property* belonging to him, which was destroyed in the blowing up of the building. The assessment was confirmed by the New York common pleas. The proceedings were removed by *certiorari* into the supreme court, where the judgment of the common pleas was affirmed. (*See case more fully stated and opinions delivered in supreme court,* 17 *Wendell,* 285, *et sequitur.*) The corporation sued out a writ of error.

The cause was argued here by

*R. Emmett & D. B. Ogden,* for the corporation.

*D. Lord, Jun., & R. Sedgwick,* contra.

Points insisted on by counsel for plaintiff in error:

I. The claim of the defendants in error must be strictly confined to the statute under which they have proceeded.

II. Under the statute, no damages can be assessed for *personal chattels* destroyed.

III. Damages should not be assessed for property which would have been *inevitably* destroyed by the fire, had no order been made by the city magistrates.

IV. The inquisition is erroneous: because damages were assessed for the destruction of the *personal property* of David N. Lord; and in respect to the damages assessed for the *building,* which, according to the testimony, could not have been saved.

V. The inquisition is contrary to law and evidence,

In support of these several propositions, the counsel cited, 1 *T. R.,* 52; 1 *Dyer,* 36, *b.*; 1 *Dallas,* 363; 2 *Kent's Comm.,* 338; 2 *R. S.,* pt. 1, ch. 14, tit. 2, art. 3, § 29.

Points insisted on by counsel for defendants in error:

I. Rufus L. Lord, as owner of the reversion, and David N. Lord, owning a term of one year in the premises, were parties, having an estate or interest

The Mayor, &c. of New-York *v.* Lord.

therein, and were therefore parties interested within the letter of the statute.  (3 *Kent's Comm.,* 466 ;  4 *Paige,* 457 ;  4 *Taunt.,* 46 ;  18 *Vesey,* [128] 116.)

II.  Compensation for the goods of David N. Lord is required by that principle of natural law and justice on which the statute is founded, and which is recognized by the constitution of the United States and of the state of New York, viz. : that property shall not be taken for the public benefit without just compensation. (6 *Cowen,* 525 ;  *Ex parte Jennings,* 11 *Wendell,* 151, 154 ; 13 *Id.,* 372 ; 5 *Paige,* 158 ; *Puff. Bk.,* 2, ch. 6, § 8.)

III.  The destruction of the goods of David N. Lord was " damages sustained by the destroying of the building," in the common acceptation of those words, and also in the common law sense.  The loss of goods by an act of force, or violence done to the building, is, at common law, an incident to the trespass. It is a mere aggravation, and recoverable as damages incident to the violence done to the building or land.  (*Radcliff* v. *Eden, Cowper,* 485 ; 7 *Statutes at large.  Douglass,* 699 ; *Gould on Pleading, pl.* 10, *p.* 52, *pl.* 110, *p.* 366 ; 9 *Wendell,* 325 ; 1 *Hall's R.,* 64 )

IV.  The compensation which the statute gives must be as extensive as the satisfaction which it declares shall result therefrom.  The satisfaction is of " all demands by reason of the destroying of such building."  The destruction of goods forms a demand, and therefore is within the statute.  The words in the statute are used to indicate all consequential damages not excluded by remoteness.  (8 *Cowen,* 148.)

V.  Such compensation is within the equity of the statute.  The principle of equity applies more strongly to the goods than to the building.

VI.  It is also within the policy of the statute, and the statute is remedial. (*Co. Litt., b.* 24, *p.* 365 ; *Litt.,* § 21 ; *Viner's Abr. Statute Construction, E.* 6, *pl.* 32, 38, 39, 43, 44, 45, 53, 54, 55 ; *Com. Dig. Parliament R.,* 13, 15 ; *Bacon's Abr. Statute,* I. 6 ; *Dwarris on Statutes,* 718, 728, 734.)

VII.  The interest of the lessee in the building from the time when he was ordered to remove, to the time when the fire would have reached [129] the building in its natural course, if at all, was of as much value to him as the goods he might in that time have removed.

According to this rule, the lessee is entitled to compensation for his goods, upon the strictest construction of the statute.

VIII.  The damages assessed by the jury should have been the intrinsic value of the property destroyed.

IX.  The court cannot, on *certiorari,* review the facts, but only the law of the case.  (6 *Wendell,* 564.)

After advisement, the following opinions were delivered :

By the CHANCELLOR.  The only real question in this case is, whether the lessee of the store, which was destroyed by direction of the public authorities of the city of New York, during the great fire, is entitled, upon a fair construction of the statute on this subject, to compensation for the actual loss or damages which he sustained by the destruction of his goods, which, as such lessee, he had in the store at the time it was blown up ; which loss, according to the finding of the jury, under the decision and charge of Judge Irving, must be considered as the direct and necessary consequence of the destruction of the store, at the time and under the particular circumstances in which such destruction thereof took place or was affected.  Upon this question I so fully concur with the able and conclusive reasoning of the first judge of the court of common pleas, and of the learned chief justice of the supreme court, who delivered the prevailing opinion in that court, that it appears to be almost a useless waste of time to attempt to go over any part of the same ground.

The principle appears to be well settled, that in a case of actual necessity, to prevent the spreading of a fire, the ravages of a pestilence, the advance of a

hostile army, or any other great public calamity, the private property of an individual may be lawfully taken and used or destroyed, for the relief, protection or safety of the many, without subjecting those whose duty it is to protect the [130] public interests, by whom or under whose direction such private property was taken or destroyed, to personal liability for the damage which the owner has thereby sustained. Where the same extent of loss or injury would have been sustained by the individual, as the necessary consequence of the fire or other public calamity, if his property had not been thus taken and destroyed for the protection of others, it may be considered as at the least doubtful whether he has any equitable claim to compensation, either from the public in general, or from that portion of the community for whose particular benefit or protection his private property was taken or sacrificed; for in such a case, although others have been benefited, he has in fact sustained no damage thereby. It is very clear that the individual could not claim compensation *for such a loss,* under the statute we are now considering, which limits the amount of the assessment to *damages* actually sustained by the pulling down and destruction of the building. On the other hand, it is very evident that if the private property of an individual, the whole or a part of which might otherwise have been saved to the owner, is taken or destroyed for the benefit of the public, or of the inhabitants of a particular county, city, town or other smaller section of the community, those for whose supposed benefit the sacrifice was made, ought in equity and justice to make good the loss which the individual has sustained for the common benefit of all. It is upon this great principle of natural equity that maritime contributions are founded; as in the case of a *jettison,* where the property of an individual is cast into the sea, or otherwise sacrificed, with a view to the safety of the vessel and the residue of the cargo, during an impending peril. In that case, the vessel and freight and the residue of the cargo, which are thus saved by the sacrifice of a part, all contribute ratably to make good the loss to the individual whose property has been sacrificed for the common benefit. But where the jettison does not divert the impending evil, so that the same loss would have occurred to the individual by the same peril, if his property had not been thus sacrificed, he has no claim for contribution from the owners of the vessel and the residue of the cargo, who [131] have all shared with him in a common calamity. *Casaregis* puts a case, very similar to the one now under consideration, of the destruction of a vessel in port, lying near to another vessel which is on fire, to prevent the flames from spreading and being communicated to other vessels. He considers the compensation to the owner of the vessel thus destroyed, as a proper subject of maritime contribution by the owners of the other vessels and cargoes which were saved from the impending peril. (*Casaregis Disc.,* 46, *No.* 45, 63.) As the constitution has declared that private property shall not be taken for the public use without just compensation, if the property of individuals which would otherwise have been saved, was actually sacrificed during the great fire to save the city from impending peril, and the present statute is not broad enough to reach such cases, the legislature, even at this time, has the power to direct a proper compensation to be made; to be assessed either upon the whole city, or upon that portion of it which the legislature in its wisdom may think should contribute to make good the loss. Although these principles of natural equity cannot extend the present statutory provision on this subject beyond what was clearly intended by the legislature at the time the law was made, they are very proper to be taken into consideration, in a case of doubt, for the purpose of ascertaining the meaning of the lawgivers, where the language used to express the legislative will is of doubtful import, or may fairly admit of different interpretations.

The imperfections of human language, and the different modes of expression in use among different individuals, even of the same state or government, to convey their ideas, wishes and intentions to the minds of others, render it morally impossible that the language of any general legislative provision, which is in-

The Mayor, &c. of New-York *v.* Lord.

tended to govern future cases, can be made so certain and explicit as not to ad‧ mit of a doubt as to its proper interpretation or legal construction, when it is afterwards to be applied to the peculiar circumstances of some cases which may arise and may be brought before the judicial tribunals for decision, in reference to such statute. For this reason it has been found necessary to establish a system of legal *hermeneutics*, or fixed principles of interpretation and con- [132] struction of legislative enactments, to ascertain the meaning and intent of the lawgiver. For similar reasons, certain fixed rules of judicial construction are resorted to by courts of justice, for the purpose of giving a proper construction to the terms of a grant from the government, or from a private person, the mean‧ ing of a testamentary disposition of property, or the true interpretation of the language which parties have used in any written contract. Among these fixed principles, or rules for the interpretation and construction of statutes, which have been adopted in this country and in England, is that of construing the statute by equity, so as to produce neither injustice nor absurdity, where the language of the statute is such as to admit of different interpretations or constructions; and I believe we hold these principles of interpretation in common with every other country which is blessed with an enlightened system of jurisprudence. In the language, therefore, of an eminent Scotch civilian, " where the strict letter of the law seems contrary to its spirit, or to equity, judges ought not so much to regard the proper or received signification of the *words*, as that meaning which appears most consonant to the *design of the law.*" (*Ersk. Inst. b.* 1, *tit.* 1, § 52.) And he bids fairest for a just interpretation, who keeps constantly in view the mischiefs or defects which existed in the former laws on the same subject; the remedies which the statute has provided to cure them; how far these remedies are proper, and what sense appears most congruous to its subject matter and most agreeable to equity. (*Idem.* § 58.)

In relation to the subject under consideration in this case, the defects which existed in the common law were, that where it might become necessary for the officers of the corporation to destroy property of an individual to prevent the ravages of a fire, no provision was made for compensating the individual for his private property which was taken for the benefit of others; and notwithstanding the officers were protected from personal responsibility, where they could show that the destruction of the property was necessary to produce the effect, they were, by the common law, bound at their peril to decide correctly as to such [133] necessity, to protect themselves from liability to make good the loss. Al- though the legislature seem to have supposed that it was only necessary to give to the officers of the corporation a discretionary power to pull down or destroy *buildings* to arrest the progress of the fire, it can hardly be presumed that they did not intend to extend this protection to the officers, as well as the compensation to the individual whose property was thus taken or destroyed, to all cases of de- struction which were the necessary consequences of a correct and judicious exer- cise of the power expressly given by the statute. The language of the 81st section of the act certainly extends the protection of the officers to every claim for damages on the part of those who were interested in the building, provided such damages were the direct and necessary consequence of the destruction of the building, at the time and in the particular manner in which such destruction was effected. The terms of the statute are, that the sums assessed by the jury shall be paid to the several persons in whose favor the jury have assessed the same, in full satis‧ faction of *all demands* of such persons respectively, by reason of the pulling down or destroying such buildings. Even if the officers of the corporation had made a mistake in blowing up this building sooner than was necessary to prevent the further progress of the flames, by which goods of the lessee were destroyed, which might otherwise have been saved, the payment of the damages assessed to him as the lessee of the building, would be a valid defence to any action brought against them for such loss of his goods, which was the necessary consequence of their

The Mayor, &c. of New-York v. Lord.

legalized act. The terms of the act appear also sufficiently broad to give to the owner or lessee of the building an assessment of all the damages he has sustained by the pulling down and destroying of such building, without giving him an opportunity to remove his goods therefrom. In such a case, the loss of the goods may as legitimately be considered a damage sustained by the destruction of the building, as the loss of the building itself. Both are equally within the spirit and equity of the statute; and no good reason can be assigned why [134] the individual, whose property is thus taken and destroyed for the preservation of the city, should not be compensated as well for one part of the injury as for the other. The suggestion that the corporation would not have been willing to destroy the building before the removal of the goods, if they had supposed the loss was to fall upon the city in general, instead of the private individual whose property they were about to sacrifice, can hardly require a serious answer, in a country where legalized power on the part of. the government is not permitted to triumph over the equitable rights of individuals. Certainly, if it was not a proper case to cast the burthen of the loss upon the city, which was to be benefited by the blowing up of the building before there was time to remove the goods, there could have been no reason which should have induced the legislature to empower the officers of the corporation to do the same act, and thereby throw the whole loss upon the unfortunate individual whose goods were thus sacrificed. Whether the case of the destruction of the goods of a *third person*, by the blowing up of a building in which he was not interested, otherwise than by having his goods deposited therein for safe keeping, is within the equity of the statute, is a question which it is not necessary or proper to consider at the present time; but if it is not within it, it must be because the statute has made no provision for the assessment of the damages in such a case. And a mere neglect of the legislature, to provide for a particular case which was equally within the mischiefs which were intended to be remedied by the law, affords no sufficient grounds for supposing that it was intended to exclude others which are clearly within the letter as well as within the equity of the statute. The language of the 83d section is to be construed with reference to the provisions of the 81st section, and the change in the phraseology cannot be considered as a restriction of the plainer and more appropriate language used in the previous section.

The cases of *Radcliffe* v. *Eden*, (1 *Cowp. R.*, 485;) *Hyde* v. *Cogan*, (2 *Dougl. R.*, 699,) and *Wilmot* v. *Horton*, (*id.*, 720, *note*,) all founded upon the act for the prevention of tumultuous and riotous assemblies, and making the hundred liable [135] for the damages done by a mob, in the demolishing or pulling down of a building, are very strongly in favor of the construction contended for by the defendants in error in the present case. In the two last cases, Lord Mansfield, who was one of the principal sufferers by the excesses of the mob, gave no opinion, although he did not prosecute the hundred, and declined receiving compensation from the government for his individual loss. But in the first case which came before the court of king's bench a few years before, he expressed a very clear and decided opinion that the damages sustained by the individual by the demolishing and pulling down of his *building*, included the injury sustained at the same time in the destruction of his *furniture*, although the destruction of the furniture in that case was not, as in the present case, the necessary consequence of the destruction of the building. But it was *one continued act*, and for that reason the hundred was held liable, because the case was within the equity of the statute, which statute, as to the compensation to the individual whose property was destroyed, was considered remedial, although it was highly penal in other respects. In the present case, the destruction of the goods of the lessee which were in the store, and which he was not allowed time to remove, was not only the immediate, but the necessary result of the blowing up of the building. The loss of that part of the goods which might otherwise have been saved, was therefore a part of the damages sustained by him as the lessee of the building, by

the destroying of the same at that particular time, and it was a proper subject of assessment by the jury, within the letter as well as within the equity of the statute ; which is also in its nature remedial.

For these reasons, I think the decision of the majority of the justices of the supreme court in this case was right, and that their judgment should be affirmed; and that the defendants in error should be allowed interest on the amount of the damages assessed by the jury, during the time that the collection thereof has been delayed by this writ of error.

*By Senator* EDWARDS.   During the fire in the city of New York, in [136] December, 1835, it became necessary for the mayor of that city to order the store of *Rufus L. Lord* to be destroyed, to prevent an extension of that devouring element.   In this store were the goods of *David N. Lord,* which were destroyed with the store.   David N. Lord having an interest in the building as *lessee,* claimed damages for the destruction of his goods, under the 81st section of the act to reduce the laws relating to the city of New York into one act.   These damages were assessed at $156,274.80.

As I view the case, the only question presented for consideration is, what construction shall be given to the eighty-first section of the act to which I have referred.   Does the act confine the assessment to the damages done to the *building* only ? or does it include the damages done to such *personal property* as any person having an interest in the building should sustain?   The section declares that when any building or buildings in the city of New York, shall be on fire, it shall be lawful for the mayor and any two aldermen to direct and order the same or any other building which they may deem hazardous and likely to take fire, or to convey the fire to other buildings, to be pulled down or destroyed; and upon the application of any person interested in such building so pulled down or destroyed, to the mayor, or recorder, or any two aldermen, it shall be their duty to issue a precept for a jury to *inquire of and assess the damages which the owner of such building and all persons having any estate or interest therein,* have respectively sustained by the pulling down or destroying thereof, &c.

What, then, is the plain import of the expressions used by the legislature to convey their meaning in this section of the act?   In the first place, let us inquire who are the persons who are to make the application for damages?   Any person interested in such building so pulled down or destroyed.   Is a tenant interested?   I concede he is, to the amount in value of his unexpired term, and that he has a right to make his application, but he must make it in the capacity of a *tenant;* for it is that capacity, and that only, which gives him an interest under the statute that enables him to apply for damages. [137] What damages can he apply for?   Those he has sustained in the capacity in which he stood at the time; that is, in the capacity of a tenant holding an unexpired term in the building.   And what damages were the jury, under the order, to inquire of and assess?   Surely, none other than such as he was authorized under the act to make application for.   Besides, the subsequent phraseology made use of in the act, limits the power of the jury to the *building.*   The words are, " the damages which the owner of such building, and all persons having any estate or interest therein."   What does the expression *therein* refer to ?   Most clearly to the building.   It cannot refer to the goods or the personal property of the applicant, for there is no such property mentioned in the act, or any expression made use of sufficiently broad and comprehensive to include that species of property.   The damages, therefore, the jury are to assess, are for the destruction of the value of the unexpired term of the tenant, and nothing more, for this is all the *interest* the applicant had *in the building* itself, 'at the time it was destroyed.   The same section proceeds to declare that the sums assessed by the jury, shall be paid by the mayor, to the respective persons in whose favor the jury have assessed the same, in full satisfaction of all demands of such persons respectively, by reason of the pulling down and destroying such buildings.   But this

part of the section does not appear to me to enlarge its meaning in express terms nor can I infer from it, that the legislature intended any other damages, than such as they had already expressed in the former part of the section. In full satisfaction of all *demands* of such *persons*, evidently means such *persons* as owned or had an estate or interest in the building destroyed; and all *demands* as evidently means such as the jury should assess for the destruction of the value of the interest in the buildings, and nothing more. The words, *by reason of the pulling down*, &c., which seem to be relied upon by the counsel for the claimant, to show the damage to the goods might be included, as it appears to me, are pre- [138] cisely such words as the legislature might very properly have selected, in reference to damages done to the *building only*. Upon the whole, I am inclined to believe, that it was hardly possible for the legislature to have selected words to convey their meaning, more definite, clear, and explicit, than they have done in this section.

But if it were possible to raise a doubt, with respect to the *intention* of the legislature, the eighty-third section has most effectually dispelled it. This section explicitly declares for what the damages are to be assessed. It provides that the sum assessed by the jury *for any building so pulled down or destroyed as aforesaid, &c.*, shall be borne and defrayed, &c. What words or expressions could be selected to shew more clearly that the legislature intended the assessment to be for the destruction of the *building only ?* Besides, had the legislature intended to have included damages done to *personal property*, would they not have said so in express terms, or at least in terms much more broad and comprehensive than those they have made use of in this act ? If they had so intended, can we reasonably presume they would have confined their expressions to the *damages done to the building* in every instance, and not have mentioned in any part of the act, *personal property*, which they could not fail to know, far exceeded in value the buildings in that city, which would probably be liable to be destroyed ? They might have had sufficient reason for not including this species of property. They might not have contemplated a case where it would be necessary to cause destruction of the buildings in the very unusual and extraordinary manner resorted to in this instance, and might have supposed in the ordinary way of destroying buildings by pulling them down, personal property could be removed. But whatever may have been their motive, in not including this species of property, is quite immaterial. We cannot enter into an examination of the motives of the legislature for not including it. It is sufficient that this kind of property is not embraced within the provisions of the act.

We have been referred to some of the rules adopted by the courts [139] in England, for the construction of doubtful words and expressions in statutes, to aid us in giving this statute a full and fair interpretation; but I cannot believe any aid can be derived from them in construing this act. There are not, in my view, any doubtful words or expressions, which can render a resort to the aid of such rules necessary, or even justifiable. When the words and expressions in which the legislature have chosen to convey their meaning, are not of doubtful import, we are to presume they shew the intention of the legislature; and to resort to the rules applicable to the construction of doubtful statutes in such cases, serves rather to embarrass, than aid the construction. These rules are useful and salutary when properly applied; but when improperly applied, they are as liable to make law, as they are to determine what the law is. I think there is much reason and good sense in the remark of Chief Justice Willes, in the case of *Wimsbick* v. *Tuilbays* (*Plowd.*, 57), where he says, "When the words of an act are doubtful and uncertain, it is proper to inquire what was the intention of the legislature; but it is very dangerous for judges to launch out too far in searching into the intent of the legislature, when they have expressed themselves in plain and clear words." See also *Cobhan* v. *Cook*, (*Willes' R.*, 397). Mr. Justice Chace, in the case of *Priestman* v. *The United*

7(?)

*States,* (4 *Dall. R.*, 30, *note* 1), also entertained similar views, and expresses it as his opinion, that under the English rules of construction, the English judges had *made* many of the statute laws of the realm. Coming to the conclusion that the legislature has expressed its meaning in plain and clear words, free from ambiguity and doubt, without indulging in speculations, either upon the policy or hardship of the law, I am compelled to say, that in my judgment the statute does not embrace the defendant's damages for the loss of his goods.

Whether the defendant has or has not a right, at common law, to recover damages, cannot affect the question under consideration. If he had such a right, the statute has not affected it, he can still avail himself of it; if he had not such a right, it is no reason to shew the statute intended to confer it upon him.

Nor can it avail him anything, should it be admitted that the property was [140] taken for public purposes, and that, under the constitution, property cannot be taken for public use without just compensation, if there is no provision in the act which includes the property in question. This would only be a reason to shew what the act should provide, and not what it had provided. The question with us is not what the act should be, or what it ought to provide; or whether it is expedient or inexpedient. These are questions for the makers of the law, but not for the expounders. It is simply to determine what the law is, and apply it. Has this statute authorized the jury to assess the damages for the destruction of the goods in question? Whatever may be my individual sympathy for the sufferers, and however freely I should be disposed to indulge in it on other occasions, my duty here forbids it. I feel constrained from the obligations here imposed upon me, and from the best reflection I have been able to give this subject, to say, unhesitatingly, that in my judgment, the statute does not intend to embrace the damages for the destruction of the *personal property* in question; and that therefore, in my opinion, the jury were not authorized to assess these damages, and that the judgment of the supreme court should be reversed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* Senators Edwards, Hunter, Lacy, Lawyer, McLean, Wager.—6.

*In the negative:* The President of the Senate, the Chancellor, and *Senators* Armstrong, Beckwith, Downing, Fox, Huntington, H. F. Jones, Loomis, Mack, Maison, Paige, Spraker, Sterling, Van Dyck, Willes. —16.

Whereupon the judgment of the supreme court was affirmed.

Judgment affirmed.